IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| JACK FINNEGAN, | : |
| Plaintiff, | : |
| v. | : Civil No. 21-20556 (RBK/MJS) |
| ROMAN CATHOLIC ARCHDIOCESE OF PHILADELPHIA, | : **OPINION** |
| Defendant. | : |

**KUGLER**, United States District Judge:

This matter comes before the Court on Defendant Roman Catholic Archdiocese of Philadelphia's (the "Archdiocese") Second Motion to Dismiss for Lack of Jurisdiction (the "Motion" or "Mot.") (ECF No. 8). The Archdiocese originally moved to dismiss Plaintiff Jack Finnegan's claims on the same grounds in January 2022. At that time, we were skeptical about whether this Court had personal jurisdiction over the Archdiocese. But, given the gravity of Finnegan's allegations and the nonfrivolous nature of his claims, we denied that initial motion without prejudice and ordered a period of jurisdictional discovery to allow Finnegan to try to find and adduce any evidence showing that this Court does, in fact, have personal jurisdiction over the Archdiocese. Unfortunately, no such evidence materialized.

Therefore, for the reasons below, the Court **GRANTS** the Motion. We will not, however, fully dismiss Finnegan's claims. Instead, we will **TRANSFER** this case to the Eastern District of Pennsylvania.

1

I.  **BACKGROUND**

A.  **Factual Background**

Finnegan alleges that when he was a minor living in Philadelphia during the 1960s, Father John Kline, now deceased, serially abused, groomed, groped, and raped him. (ECF No. 1-2, Complaint, "Compl." at ¶¶ 1–2, 4–5). During that time, Finnegan maintains the Archdiocese employed Kline. (*Id.* at ¶¶ 6–7). The Archdiocese is a religious organization that oversees 257 parishes in five Pennsylvania counties: Philadelphia, Bucks, Chester, Delaware, and Montgomery. (*Id.* at ¶ 3). Its headquarters are in Philadelphia. (*Id.*). According to Finnegan, Kline served at various Archdiocese-run parishes, including the St. Francis Xavier Parish. (*Id.* at ¶¶ 6–7). Kline also taught at the Roman Catholic High School of Philadelphia. (*Id.* at ¶ 9). Finnegan attended St. Francis Xavier Parish School and Roman Catholic High School, he was an altar boy, and his family worshiped in the St. Francis Xavier Parish. (*Id.* at ¶¶ 20–21).

Kline first abused Finnegan during the summer of 1960. (*Id.* at ¶ 24; Mot., Ex. D, Excerpts of Jack Finnegan's October 25, 2022 Deposition, "Finnegan Depo" at 46–50). Kline invited an eight-year-old Finnegan and his family to his friends' house in Cherry Hill, New Jersey, where Finnegan swam in the pool. (Finnegan Depo at 46–48). Later, everyone else went inside and left Finnegan alone with Kline. (*Id.* at 46–47). While they were alone, Kline took Finnegan to the shower where he grabbed Finnegan's penis and scrotum. (*Id.* at 47).

This was, sadly, not the only time Kline abused Finnegan. Kline brought Finnegan into his room in the rectory at the parish in Pennsylvania to give "confession" many times after that first assault in Cherry Hill. (*Id.* at 50–52). When asked how many times he remembered Kline abusing him in that room at the parish, Finnegan responded that he did not know. (*Id.* at 51–52). Kline also abused Finnegan many times in his car. (*Id.* at 52). Although he did not testify to it

2

during his deposition, Finnegan alleged in his Complaint that Kline also assaulted him on multiple occasions at a Dunkin Donuts in Camden, New Jersey. (Compl. at ¶ 32).

In his deposition, the final place Finnegan reported Kline abused him was a vacation home located in Long Beach Island, New Jersey. (Finnegan Depo at 58–64). Finnegan's family rented the house for the summer from another family. (*Id.* at 60). Kline arrived one morning and apparently waited for Finnegan while he was at the beach. (*Id.* at 60–61). While Finnegan was showering, Kline entered the shower and started masturbating while watching Finnegan. (*Id.* at 58–59). After, Kline took confession from Finnegan's family and stayed overnight. (*Id.* at 61–62). Kline then performed mass at the house the next day for the Feast of the Assumption, a catholic holy day. (*Id.* at 63). Finnegan's family and one of his friends attended the mass. (*Id.*). According to Finnegan, Kline performed the mass at the house for Finnegan's mother. (*Id.*). When asked if he knew why Kline did the mass at the house and his family did not attend mass at the local Long Beach Island church they usually attended instead, Finnegan said he did not know. (*Id.* at 63–64).

Kline apparently came to the Long Beach Island house at least once annually to perform mass for Finnegan's family for the Feast of the Assumption in August. (*Id.* at 156). The Complaint alleges that multiple parishioners outside of Finnegan's family attended the Feast of the Assumption masses at the Finnegan's rented summer home, but, in his deposition, Finnegan said that other than the one occasion when his friend was there, no one else attended these masses or confessions. (*Id.* at 160–61; Compl. at ¶ 45).

In his Complaint, Finnegan alleged that Kline repeatedly assaulted him at a summer home his family rented in Ventnor, New Jersey. (Compl. at ¶ 34). During his deposition, though, Finnegan never mentioned his family renting or staying in a house in Ventnor, New Jersey, just

3

Long Beach Island. He also specifically stated that the only places he remembered Kline's assaults took place were the house in Cherry Hill, Kline's room at the parish rectory, Kline's car, and the Long Beach Island house. (Finnegan Depo at 58).

As to the Archdiocese, according to a declaration signed by the Archdiocese's Director of the Office of Property Services—which is responsible for maintaining the Archdiocese's real estate records—the only New Jersey property the Archdiocese owned during the 1960s were two properties located in Ventnor, New Jersey. (Mot., Ex. E, Declaration of Philip Schneider, "Schneider Decl." at ¶¶ 1–2, 5). Finnegan's Complaint alleged that Kline stayed at a convent owned by the Archdiocese, Villa Maria by the Sea, many times when he came to stay at the New Jersey shore. (Compl. at ¶¶ 38–39). The Archdiocese does not and has never owned Villa Maria by the Sea. (Schneider Decl. at ¶ 11).

**B.     Procedural Background**

Finnegan initially filed his Complaint for this case in New Jersey state court on November 30, 2021. (ECF No. 1-2). The Complaint sets forth seven counts against the Archdiocese: (1) negligence; (2) negligent supervision; (3) negligent hiring and retention; (4) gross negligence; (5) intentional infliction of emotional distress; (6) breach of fiduciary duty; and (7) punitive damages. (*Id.* at 12–20). On December 16, 2021, the Archdiocese removed the case to this Court. (ECF No. 1). The Archdiocese then filed its First Motion to Dismiss for Lack of Jurisdiction under Federal Rule of Civil Procedure 12(b)(2) on January 4, 2022. (ECF No. 2). On September 20, 2022, this Court denied that motion without prejudice and granted Finnegan thirty days to conduct expedited discovery limited specifically to the issue of personal jurisdiction. (ECF No. 7). After the discovery period ended, on January 6, 2023, the Archdiocese filed the

instant Motion. (ECF No. 8). Finnegan opposed the Motion on February 24, 2023. (ECF No. 11, "Pl. Opp'n"). On March 17, 2023, the Archdiocese replied. (ECF No. 15, "Def. Reply").

## II. LEGAL STANDARD

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of establishing the court's jurisdiction over the moving defendants. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007). When a district court does not hold an evidentiary hearing on the motion to dismiss, though, the plaintiff need only establish a prima facie case of personal jurisdiction and is entitled to have all allegations taken as true and factual disputes drawn in its favor. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).

Despite having all reasonable inferences drawn in its favor, the plaintiff cannot rely on the bare pleadings alone to defeat a defendant's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. *Patterson by Patterson v. F.B.I.*, 893 F.2d 595, 603 (3d Cir. 1990). The plaintiff must respond by establishing jurisdictional facts through sworn affidavits and competent evidence, not through mere allegations. *Id.* at 604. Thus, the Court may rely on documents outside the pleadings because a Rule 12(b)(2) motion "is inherently a matter which requires resolution of factual issues outside the pleadings, i.e., whether in personam jurisdiction actually lies." *Id.* at 603.

## III. DISCUSSION

The New Jersey long-arm statute permits courts to exercise personal jurisdiction to the fullest extent allowed by the Due Process Clause of the U.S. Constitution. *IMO Indus., Inc. v. Kiekert, AG*, 155 F.3d 254, 259 (3d Cir. 1998). Under the Due Process Clause, Finnegan may establish that this Court has personal jurisdiction over the Archdiocese in one of two ways:

general or specific jurisdiction. Finnegan concedes that this Court lacks general jurisdiction over the Archdiocese. (Pl. Opp'n at 11). Thus, we will only consider whether this Court can exercise specific jurisdiction over the Archdiocese.

"Specific jurisdiction exists over a non-resident defendant where the plaintiff's claim 'arise[s] out of or relate[s] to the defendant's contacts with the forum.'" *Doe v. Archdiocese of Philadelphia*, Civ. No. 19-20934, 2020 WL 3410917, at *2 (D.N.J. June 22, 2020). "There are two prongs to the specific jurisdiction analysis. First, there must be purposeful availment: minimum contacts with the forum state that show the defendant took a deliberate act reaching out to do business in that state. Second, the contacts must give rise to—or relate to—plaintiff's claims." *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021) (internal citations omitted) (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021)). If those two prongs are met, then the Court may analyze whether exercising personal jurisdiction over a particular defendant "comport[s] with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 320 (1945)). If the first two prongs are not satisfied, then the Court need not assess reasonableness. *See id.* at 476–77 (holding that, once a court finds that a defendant has minimum contacts with a state, a court "may" consider reasonableness "in 'appropriate case[s.]'").

Finnegan has not established that the Archdiocese purposely availed itself of New Jersey and its laws. As far as the jurisdictional discovery showed, the Archdiocese never deliberately targeted New Jersey. *O'Connor*, 496 F.3d at 317 ("[W]hat is necessary is a deliberate targeting of the forum."). "The unilateral activity of those who claim some relationship with a nonresident

defendant cannot satisfy" the purposeful availment requirement. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

When we denied the Archdiocese's first motion to dismiss, we noted that we believed Finnegan's allegations were not frivolous and that there were enough allegations to hint at a possibility that the Archdiocese deliberately targeted New Jersey. (ECF No. 7 at 3–4). The law only requires "minimum contacts" with the forum state, and we felt the Complaint stated enough to justify jurisdictional discovery. We noted, however, that Finnegan did not "indicate whether the Archdiocese directed Kline to go to New Jersey to perform" the alleged religious services, "provide proof of the Archdiocese's ownership of the alleged shore house or the Stone Harbor convent," or "indicate whether the Archdiocese directed Kline to stay at either of these alleged New Jersey properties." (*Id.*). After discovery, Finnegan still has not established that the Archdiocese took any of those actions which could establish purposeful availment.

There was no testimony in any deposition, nor were there any statements contained in any declaration or affidavit that Kline went to New Jersey and committed any of the alleged acts—abusive, religious, or otherwise—at the Archdiocese's behest or direction. As far as discovery showed, Kline unilaterally went to New Jersey, assaulted Finnegan just as Finnegan claims, and, on his own, performed some religious services. There is no evidence that the Archdiocese told Kline to perform any masses or confessions for the Finnegans in New Jersey. During his deposition, the best answer Finnegan could give was that Kline performed these services for his mother, not because the Archdiocese told him to perform them. And Finnegan did not find and present any evidence from other sources suggesting the Archdiocese did so.

Finnegan's deposition also showed that the religious services Kline performed, except for one occasion where Finnegan's friend was present, he performed solely for the Finnegan family,

7

not the parish at large. Although the Archdiocese did employ and supervise Kline, there is no competent evidence that the Archdiocese directed him to perform any services in New Jersey, only allegations alluding to that effect. *See Patterson*, 893 F.2d at 604. Kline appears to have unilaterally decided to target New Jersey himself. We cannot say that the Archdiocese deliberately targeted New Jersey in that way. *See Doe*, 2020 WL 3410917 at *3 ("Plaintiff also does not allege that Defendant directed [the priest], in his capacity as a priest, to conduct church-related activities in New Jersey, or to take Plaintiff to New Jersey for any purpose.").

Nor can we say the Archdiocese directed any of its supervisory duties over Kline toward New Jersey—it directed them all toward Pennsylvania, where all its parishes are located. *See id.* Finnegan also cannot establish jurisdiction solely through allegations about what the Archdiocese knew or should have known because "foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980) (internal quotation marks omitted).

Discovery also revealed that the Archdiocese did not deliberately target New Jersey through some of its purported property ownership. To start, the Archdiocese provided a sworn declaration that stated, in part, that the Archdiocese never owned the convent Finnegan claimed Kline stayed at during multiple trips to the New Jersey shore. (Schneider Decl. at ¶ 11). Finnegan provided no evidence to refute that sworn statement. According to that same declaration, the Archdiocese only owned two New Jersey properties during the 1960s, both in Ventnor, New Jersey. (*Id.* at ¶¶ 1–2, 5). As discussed below, though, neither property relates to Finnegan's claims, nor do his claims arise out the Archdiocese's ownership of these properties. As such, after some discovery, Finnegan has not established evidence to show that the Archdiocese purposefully availed itself of or created minimum contacts with New Jersey.

8

For this reason alone, we do not have personal jurisdiction over the Archdiocese, but we will analyze the next prong as well. Finnegan's claims do not arise out of or relate to any purported contacts the Archdiocese has with New Jersey. When we examine the specific claims Finnegan lays out against the Archdiocese, it is clear to us that all those claims arise out of and relate to the Archdiocese's contacts with Pennsylvania. Finnegan accuses the Archdiocese of, among other things, failing "to properly screen priests, . . . to properly investigate complaints of sexual abuse, . . . [to] properly and/adequately warn parishioners, . . . [and to] properly train [employees and staff,]" as well as negligently hiring, supervising, and retaining priests it knew or should have known were sexual predators. (Compl. at 12–21). The Archdiocese is headquartered in Philadelphia. Every single one of the parishes under its domain are in Pennsylvania. To our knowledge, it has no New Jersey offices. Those claims we just listed are not the exhaustive list of accusations Finnegan levels at the Archdiocese, but they represent the pattern: all those alleged actions *taken by the Archdiocese*—not actions taken by Kline or other abusive priests— took place in Pennsylvania.

"The jurisdictional exposure resulting from a contact must be closely tailored to the contact's substantive obligations." *Doe*, 2020 WL 3410917 at *4 (citing *O'Connor*, 496 F.3d at 323). The only contacts for which there is evidence that the Archdiocese availed itself at all of New Jersey are its previous ownership of the two Ventnor properties. Finnegan's claims, though, do not arise out of or relate to the Archdiocese's ownership of those properties. Finnegan alleged in his Complaint that Kline stayed at one or both properties on occasions when he visited New Jersey to assault him and later perform religious services for Finnegan's family. But, after discovery, there is no testimonial or documentary evidence supporting that allegation. During his deposition, when speaking about the occasion where Kline assaulted him at the Long Beach

9

Island home his family rented, Finnegan did not say he knew where Kline stayed before he arrived at the house. He said Kline stayed at the Long Beach Island house overnight, and he did not say he knew where Kline went afterward. (Finnegan Depo at 60–64). Finnegan thus presents only mere allegations, not evidence, that Kline ever stayed at either Ventnor property. There is no evidence that Kline ever stayed there or, if he did, that his staying there is related to Finnegan's claims against the Archdiocese. Therefore, we cannot say that Finnegan's claims arise out of or relate to any contacts the Archdiocese has with New Jersey.

We agree with the Archdiocese that the jurisdictional limits placed on this Court by the Constitution are not coextensive with that of a private employer's jurisdiction to investigate and punish its employees. (*See* Pl. Opp'n at 4–5, 15; Def. Reply at 8–10). That argument does not withstand scrutiny. In his brief, Finnegan asks, "If the Archdiocese investigates their priests anywhere, with no jurisdictional limitations on their authority, why should the Court recognize and be subjected to such a limitation when the abuse occurred within its jurisdiction?" (Pl. Opp'n at 15). The answer is because the Archdiocese is a private employer who may investigate and sanction its employees within the bounds of state and federal law, whereas this Court is an arm of the United States federal government subject to and limited by the constraints set forth by the Due Process Clause of the United States Constitution as interpreted by the United States Supreme Court. The Constitution does not restrict a private employer's ability to punish an employee who has committed a heinous and reprehensible act in the same way that it restricts this Court from hearing lawsuits against defendants over which it does not have jurisdiction. Finnegan must establish that the Archdiocese itself deliberately targeted New Jersey and that the contacts such targeting created relate to his claims. He has not done so. This Court also may not pass on this jurisdictional question and permit full discovery, as Finnegan requests. (Pl. Opp'n at

13). We gave Finnegan an opportunity to find the evidence he seeks. Unfortunately, it seems he failed to do so. If this Court does not have jurisdiction over the Archdiocese, it does not have the authority to order any more discovery than the limited jurisdictional discovery it already authorized.

Finnegan's Complaint, argument, and deposition testimony speak long, often, and detailed about the horrors Kline committed against Finnegan. These were despicable, depraved acts, which we condemn as forcefully as one can. But they do not speak to the Archdiocese's actions in or directed toward New Jersey. Finnegan admits that discovery "failed to confirm" that the Archdiocese directed Kline to perform any religious services in New Jersey or that the Archdiocese directed Kline to stay at any properties it owned in New Jersey. (*Id.* at 12). That is precisely the problem. The burden to establish jurisdiction rests squarely on Finnegan. *O'Connor*, 496 F.3d at 316. Finnegan has not provided evidence to show the Archdiocese purposefully availed itself of New Jersey or that his claims arise out of or relate to any contacts the Archdiocese has with this State. Therefore, this Court does not have specific jurisdiction over the Archdiocese, and we will grant the Archdiocese's Motion.

That said, we will not dismiss this case outright. Pennsylvania has personal jurisdiction over the Archdiocese, and the Archdiocese is headquartered in Philadelphia. Additionally, Finnegan's claims all relate to conduct by the Archdiocese done within the Eastern District of Pennsylvania. Therefore, venue would be proper in the Eastern District of Pennsylvania, and Finnegan could have originally filed his case there. Further, dismissal is a "harsh remedy[,]" and the law prefers transfer of venue where appropriate. *See NCR Credit Corp. v. Ye Seekers Horizon*, 17 F. Supp. 2d 317, 319 (D.N.J. 1998) (citing *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962)). Contrary to the Archdiocese's contention, (*see* Mot. at 3, n.2), we believe transfer is

appropriate here. If the Archdiocese wishes to present any statute of limitations or res judicata arguments as affirmative defenses, it may do so in the new forum. Consequently, pursuant to 28 U.S.C. § 1406(a), we will transfer this case to the Eastern District of Pennsylvania.

## IV. CONCLUSION

For the reasons above, the Court **GRANTS** the Motion. The Court will further **TRANSFER** this case to the Eastern District of Pennsylvania. An appropriate Order follows.

Dated: September 7, 2023                                        /s/ Robert B. Kugler
                                                                                                                                          ROBERT B. KUGLER
                                                                                                                                          United States District Judge